UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Penny Behrens,

       Plaintiff,

              Civ. No. 04-2685 (RHK/JSM)
              **MEMORANDUM OPINION
              AND ORDER**

v.


Metropolitan Airports Commission,
Timothy Blaylark, and
Adam L'Heureux,

       Defendants.

---

J. Poage Anderson, John A. Fabian, and Katherine C. Bischoff, Nichols, Kaster & Anderson, PLLP, Minneapolis, Minnesota, for Plaintiff Penny Behrens.

Michael B. Chase, Chase Law Office, Minneapolis, Minnesota, for Defendant Timothy Blaylark.

William J. Egan, William J. Egan, PLC, Edina, Minnesota, for Defendant Adam L'Heureux.

---

**Introduction**

  This case involves alleged misconduct in the workplace. Plaintiff Penny Behrens works for Defendant Metropolitan Airports Commission ("MAC"), where she was supervised by Defendant Adam L'Heureux and Defendant Timothy Blaylark. While working for the MAC, Ms. Behrens alleges that she was subjected to battery, assault, and sex discrimination, and was retaliated against for complaining about it. Before the Court are

Mr. L'Heureux's and Mr. Blaylark's separate Motions for Summary Judgment.[1] For the reasons set forth below, the Court will grant the Motions in part and deny them in part.

## Background

### A. The Parties

Ms. Behrens works[2] for the MAC Police Department as a Community Service Officer ("CSO"). The regular duties of a CSO involve patrolling the drive-up areas at the Minneapolis-St. Paul International Airport. Ms. Behrens began working for the MAC on September 23, 2002 after working several years as a police officer with the Minneapolis Police Department. At all relevant times, Ms. Behrens's immediate supervisor was Mr. L'Heureux, the CSO Lead[3]; Mr. L'Heureux's immediate supervisor was Mr. Blaylark, the CSO coordinator; and Mr. Blaylark's supervisor was non-party Terri Green, the CSO Manager. (See Behrens Aff. ¶¶ 3, 5, 15; Behrens Dep. Tr. at 15; L'Heureux Dep. Tr. at 12-14.)

### B. Mr. L'Heureux's Alleged Conduct

Ms. Behrens alleges that Mr. L'Heureux often made gender-biased remarks at work. On Ms. Behrens' first day at work, while she was riding in a vehicle with Mr. L'Heureux, "every other word out of his mouth was fuck regarding" Ms. Behrens. (Behrens Dep. Tr. at 30-33.)

---

[1] The MAC has not filed a summary judgment motion.

[2] Ms. Behrens continues to work for the MAC.

[3] Mr. L'Heureux resigned from the MAC in June 2003. (L'Heureux Dep. Tr. at 23.)

On her second day of work, September 24, 2002, Ms. Behrens made a comment about the cold temperature of a room, and Mr. L'Heureux responded, "You fucking women, always cold or complaining about something. What in the fuck do you need a jacket for? You don't work." (Behrens Aff. ¶ 4; see Behrens Dep. Tr. at 17.) Ms. Behrens complained to Mr. Blaylark and he remarked that Mr. L'Heureux had been "a problem child forever" and needed to be talked to about his behavior. (Behrens Aff. ¶ 5.)

On September 30, 2002, while in Ms. Behrens's presence, Mr. L'Heureux referred to another female as a "fucking bitch" and stated, "I'm going to fucking pile drive that bitch. Who in the hell does that bitch think she is?" (Behrens Aff. ¶ 8; see Behrens Dep. Tr. at 38-39.) Ms. Behrens again complained to Mr. Blaylark, who said "the boy needs a talking to." (Behrens Aff. ¶ 9.) Mr. Blaylark told Mr. L'Heureux that his behavior was unprofessional. (L'Heureux Dep. Tr. at 22.)

On October 7, 2002, while Ms. Behrens and Mr. L'Heureux were taking inventory of police uniforms, Mr. L'Heureux commented that he sometimes gets "bitch lashes" when it is cold outside and moisture freezes on his eyelashes. (Behrens Dep. Tr. at 53-55.)

Finally, on November 20, 2002, Mr. L'Heureux called Ms. Behrens a "fucking cunt." (Behrens Aff. ¶ 12.) Ms. Behrens complained to Mr. Blaylark about this as well. (Id.)

**C.     Mr. Blaylark's Alleged Conduct**

Ms. Behrens alleges that Mr. Blaylark made sexually-based comments to her while at work. On September 24, 2002, Mr. Blaylark told Ms. Behrens that she looked good; asked if she had a boyfriend or was gay; asked if she had ever "been with a black man" and, if

-3-

not, he could "teach her things about a black man"; that he had marital problems; and that she resembled a woman who wanted to do "kinky" things with him. (See Behrens Aff. ¶ 6.) On September 27, 2002, while Mr. Blaylark was showing Ms. Behrens around the airport, he again referred to his marital problems, said that Ms. Behrens resembled a woman who wanted to do "kinky" things with him, and remarked that "If you didn't have a man, I would be all over you, sucking on your toes and everything else I could find to suck." (Behrens Aff. ¶ 7; see Behrens Dep. Tr. at 45.)

Ms. Behrens also alleges that Mr. Blaylark touched her in an offensive manner on four occasions. First, on September 27, 2002, Mr. Blaylark engaged in "wrestling" with her and wrapped his arms around her, placed his hand against her chest, and cupped her breast. (See Behrens Dep. Tr. at 45-47; 451-52.) She testified that she suffered no physical injuries as a result of the contact. (Id. at 451-52.) When asked if Mr. Blaylark intended to injure her, Ms. Behrens testified in her deposition, "I don't know what his intentions were to be honest with you." (Id. at 452.)

Second, in late October or early November 2002, Mr. Blaylark again engaged in "wrestling" and stood in a hallway, took a defensive stance, "swatt[ed]" at her, and then placed his hands "all over" her, pressed his body against hers, and grabbed her buttocks and breast. (See id. at 72-76, 452-55.) She testified that she received "two little tiny bruises from being grabbed." (Id. at 457.) When asked whether Mr. Blaylark intended to injure her, she testified, "I can't comment what his intent was," and when later asked if he intended to cause her physical injury, she stated, "No. He was trying to grope me." (Id. at 458.)

Third, on November 20, 2002, Mr. Blaylark grabbed a radio microphone attached to Ms. Behrens's shirt and touched her breasts. (See Behrens Dep. Tr. at 88-90, 459-61; Behrens Aff. ¶ 13.) She testified that she suffered no physical injuries as a result of this incident. (Behrens Dep. Tr. at 461.) When asked "Did you feel he was trying to hurt you with this physical contact?", Ms. Behrens responded, "No." (Id. at 461.)

Finally, on November 21, 2002, Mr. Blaylark again engaged in "wrestling" and pressed his body against Ms. Behrens and grabbed her buttocks and breast. (See id. at 103-05, 465-67.) She testified that she suffered no physical injuries as a result of this encounter. (Id. at 466.) When asked "Did you believe that Mr. Blaylark was trying to hurt you on this occasion?", Ms. Behrens again responded, "No." (Id. at 466-67.)

### D. Complaint to CSO Manager and the Alleged Responses

On November 25, 2002, Ms. Behrens complained to the CSO Manager, Ms. Green, about Mr. L'Heureux's and Mr. Blaylark's conduct. (Behrens Aff. ¶ 15.) Ms. Green responded, "Who do you think you are coming in here with your complaints and jumping the chain of command," and told Ms. Behrens to take her complaints to Mr. L'Heureux and Mr. Blaylark. (Id.) After telling Ms. Green that she had already spoken to both men, Ms. Behrens was told to prepare a typewritten report. (Id. ¶ 16.)

Later that afternoon, Ms. Green called Ms. Behrens over the radio and told her to come to her office. (Id. ¶ 17.) As Ms. Behrens waited for Ms. Green in the hallway outside her office, Mr. Blaylark was standing about 20-25 feet away. (See id.; Behrens

Dep. Tr. at 188-89.) He looked directly at her and began punching the air with closed fists. (Behrens Aff. ¶ 17.) Ms. Behrens recounts the incident:

> I observed Tim Blaylark down the hallway and he took a defensive stance raising his fist and started doing punching motions directed towards me with closed hands. . . . There was no doubt in my mind that he waited for me to come up. He heard me being called over the radio. . . . The fists were closed, the look on his face, he looked very upset and angry, he looked wild. I thought the guy was going to, you know, harm me physically. . . . [H]e was so angry looking in the hallway with his eyes and the way he was punching at me and the noises he was making, it was like some professional boxer . . . ready to attack me. . . . I felt like he was trying to intimidate me, that he was going to cause me some type of bodily harm. And there was nobody around, it was just me and him in the hallway.

(Behrens Dep. Tr. at 188-91.) Ms. Behrens reported this incident to Ms. Green, but Ms. Green said, "I think you imagined it. You're just being paranoid and you have to and need to stop that." (Behrens Aff. ¶ 20.)

The next day, November, 26, 2002, as Ms. Behrens approached the entrance to the CSO office, she made eye contact with Mr. L'Heureux and he got up from his desk, slammed the door in her face, and started yelling. (See Behrens Aff. ¶ 21; Behrens Dep. Tr. at 213-14.)

Shortly thereafter, when Ms. Behrens was in the lunchroom, she again made eye contact with Mr. L'Heureux and he looked at her, stomped his foot on the ground, and turned away and laughed. (See Behrens Aff. ¶ 22; Behrens Dep. Tr. at 216-17.) Ms. Behrens briefly followed Mr. L'Heureux after he stomped his foot, but then walked the other way. (See Behrens Dep. Tr. at 503-05.) She complained to Ms. Green, but she was told to "stop being paranoid." (Behrens Aff. ¶ 23.)

Two days later, on November 28, 2002, Mr. L'Heureux again slammed the door in Ms. Behrens's face as she approached the CSO office. (Behrens Aff. ¶ 25.) Later that day, Mr. L'Heureux stared at Ms. Behrens while he was on the telephone, raised his voice, and said to the person on the phone, "So what do you want, want me to come over and slap your wife's ass around or what?" (Id.)

Ms. Behrens also alleges that both men engaged in various other conduct after her complaints:

- Mr. Blaylark failed to timely file a workers' compensation report after she suffered a work-related injury on December 2, 2002. (See Behrens Aff. ¶ 26; Behrens Dep. Tr. at 253-56, 476.)

- On January 1, 2003, Mr. L'Heureux sent her home immediately after she started an eight hour shift. (Behrens Aff. ¶ 27.)

- On January 3, 2003, Mr. Blaylark sent her home two hours into her eight hour shift. (Id. ¶ 28.)

- She was forced to work overtime outside on the roadway, when others who were forced to work overtime were assigned to easier positions. (Behrens Dep. Tr. at 98-99.)

- She was disciplined for being late when she was not late. (Id. at 130-31, 139-45.)

- She "was completely ostracized and isolated." (Id. at 231-32.)

**E.  The Litigation**

Ms. Behrens sued the defendants on five counts. With respect to Mr. L'Heureux and Mr. Blaylark, she asserts common law battery and assault claims (Count V) and reprisal in violation of the Minnesota Human Rights Act ("MHRA") (Count IV). (See Consolidated Compl. ¶¶ 78-85.) Mr. L'Heureux's and Mr. Blaylark's summary judgment motions followed.[4]

## Standard of Review

Summary judgment is proper if, drawing all reasonable inferences favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed. See Celotex, 477 U.S. at 322; Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). The court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. See Graves v. Arkansas Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997). The nonmoving party may not rest on mere allegations or denials, but must show through the

---

[4] As noted above, the MAC has not filed a summary judgment motion. Ms. Behrens asserts that, based primarily on the conduct of Mr. L'Heureux and Mr. Blaylark, the MAC engaged in sex discrimination in violation of Title VII and the MHRA (Counts I and III) and reprisal discrimination in violation of Title VII and the MHRA (Counts II and IV). (See Consolidated Compl. ¶¶ 58-81.)

presentation of admissible evidence that specific facts exist creating a genuine issue for trial. See Anderson, 477 U.S. at 256; Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**Analysis**

A.   **Battery and Assault**

A battery is an intentional unpermitted offensive contact with another. Paradise v. City of Minneapolis, 297 N.W.2d 152, 155 (Minn. 1980). An assault is an unlawful threat to do bodily harm to another with the present ability to carry the threat into effect. Dahlin v. Fraser, 288 N.W. 851, 852 (Minn. 1939).

1.   **Mr. L'Heureux**[5]

Ms. Behrens alleges that Mr. L'Heureux committed assault on three occasions: (1) on November 26, 2002, when he slammed the door to the CSO office in her face and started yelling; (2) again on November 26 when he made eye contact with her and stomped his foot on the ground; and (3) on November 28, 2002, when he slammed the CSO office door in her face. (See Mem. in Opp'n at 25-26.) Mr. L'Heureux argues that these incidents do not constitute assault because Ms. Behrens had no reasonable apprehension of immediate bodily harm. (See L'Heureux Mem. in Supp. at 12; L'Heureux Reply Mem. in

---

[5] At the motions hearing, counsel for Ms. Behrens agreed to dismiss the battery claim against Mr. L'Heureux. In fact, Ms. Behrens admitted that Mr. L'Heureux never touched her. (See Behrens Dep. Tr. at 490.) Accordingly, the Court will dismiss the battery claim against Mr. L'Heureux.

Supp. at 9-10.) Viewing the evidence as a whole, the Court finds that genuine issues of material fact exist as to whether Ms. Behrens was assaulted.[6] See Dahlin, 288 N.W. at 852.

### 2. Mr. Blaylark

Ms. Behrens alleges that Mr. Blaylark committed battery by "wrestling" with her on three occasions and by touching her breast when grabbing her radio microphone. (See Mem. in Opp'n at 23.) She also alleges that Mr. Blaylark committed assault by "wrestling" with her and by punching the air in her direction after she complained to Ms. Green. (See id. at 25.) Mr. Blaylark responds with several arguments, including that the battery and assault claims are preempted by the Minnesota Workers' Compensation Act ("WCA"). (See Blaylark Mem. in Supp. at 10-12; Blaylark Reply Mem. in Supp. at 4-6.)

With some exceptions, the WCA is intended to be the exclusive remedy for personal injury or death arising out of and in the course of employment. See McGowan v. Our Savior's Lutheran Church, 527 N.W.2d 830, 833 (Minn. 1995); Parker v. Tharp, 409 N.W.2d 915, 917-18 (Minn. Ct. App. 1987). The liability of co-employees under the WCA is governed by the so-called "co-employee exception."[7] See Meintsma v. Loram

---

[6] Unlike his co-defendant, Mr. L'Heureux does not argue that Ms. Behrens's claims are preempted by the Minnesota Workers' Compensation Act ("WCA"). However, such an argument would not entitle him to summary judgment. As discussed in more detail below, under the co-employee exception of the WCA, co-employees can be liable in a tort action if they "consciously and deliberately intend to cause an injury." See Meintsma v. Loram Maintenance of Way, Inc., 684 N.W.2d 434, 441 (Minn. 2004). Under the circumstances presented, the Court finds genuine issues of material fact exist as to whether Mr. L'Heureux consciously and deliberately intended to injure Ms. Behrens.

[7] Although Mr. Blaylark and Ms. Behrens refer to the assault exception to the WCA in their memoranda, the applicable exception in the instant Motions is the co-employee

Maintenance of Way, Inc., 684 N.W.2d 434, 441 (Minn. 2004). Under this provision, "[a] coemployee working for the same employer is not liable for a personal injury incurred by another employee unless the injury resulted from the gross negligence of the coemployee or was intentionally inflicted by the coemployee." Minn. Stat. § 176.061, subd. 5(c). "In other words, to maintain a tort action against . . . co-employees, [a plaintiff] must demonstrate that they either intentionally inflicted the injury or that the injury resulted from gross negligence." Meintsma, 684 N.W.2d at 440 (citing Minn. Stat. § 176.061, subd. 5(c)).

Because Ms. Behrens does not allege that her injuries resulted from Mr. Blaylark's gross negligence, the only issue is whether her injuries were "intentionally inflicted." The Minnesota Supreme Court has defined "intentionally inflicted" to mean that "a defendant must consciously and deliberately intend to cause an injury, not just intend to do the act." Meintsma, 684 N.W.2d at 441. Mr. Blaylark argues that he is not liable under the WCA because "the record is clear that [he] did not intend to injure Behrens." (Blaylark Mem. in Supp. at 11; see Blaylark Reply Mem. in Supp. at 5-6.) He relies on Ms. Behrens's testimony that she either did not know or did not believe that he intended to hurt or injure her and on the Minnesota Supreme Court's decision in Gunderson v. Harrington, 632 N.W.2d 695 (Minn. 2001).

---

exception. See Meintsma v. Loram Maintenance of Way, Inc., 684 N.W.2d 434, 440-42 (Minn. 2004) (applying co-employee exception to assault and battery claims against co-employees).

In Gunderson, the plaintiff alleged assault and battery claims against her employer. See Gunderson, 632 N.W.2d at 697. The plaintiff asserted that on five occasions her employer struck her in the head, but admitted either that she did not think her employer intended to injure her or that she did not know if her employer intended to injure her. See id. at 697-98, 703-04. The employer responded that the plaintiff's claims were preempted by the WCA, and that she could not establish the intentional injury exception to the WCA. See id. at 701-02. Like the co-employee exception, the intentional injury exception requires that an employee demonstrate a conscious and deliberate intent to injure.[8] Id. at 703; see Meintsma, 684 N.W.2d at 441. The Minnesota Supreme Court agreed with the employer, holding that the plaintiff failed to present sufficient evidence establishing that the employer acted with a conscious and deliberate intent to inflict physical injury. Id. at 704. The Court stated: "We are compelled to conclude that [the plaintiff's] belief that [her employer] did not intend to hurt her, her statement that she didn't know if he intended to hurt her, and her conflicting beliefs as to [one] incident do not create genuine issues of material fact of [her employer's] intent to injure her to oppose summary judgment." Id.

Following Gunderson, this Court is compelled to hold that with respect to the three wrestling incidents and the microphone grab, Ms. Behrens's belief that Mr. Blaylark did not intend to injure her and her statements that she did not know if he intended to hurt her do not create genuine issues of material fact of Mr. Blaylark's intent to injure her. (See

---

[8] Unlike the co-employee exception, the intentional injury exception applies to employers. See Meintsma, 684 N.W.2d at 440.

-12-

Behrens Dep. Tr. at 452, 457-58, 460-61, 466-67.) Additionally, Ms. Behrens suffered no physical injuries during these incidents, with the exception of "two little tiny bruises" on one occasion. (See id. at 451-52, 457, 461, 466.) Because there is insufficient evidence of Mr. Blaylark's intent to injure her on these occasions, Ms. Behrens cannot maintain her common law battery and assault claims stemming from these encounters. See Gunderson, 632 N.W.2d at 704; Meintsma, 684 N.W.2d at 441. However, with respect to the air punching incident, there is sufficient evidence that Mr. Blaylark consciously and deliberately intended to cause an injury. (See Behrens Dep. Tr. at 188-91.) As a result, Mr. Blaylark's intent on that occasion is a question for the jury to decide. See Meintsma, 684 N.W.2d at 441. In sum, each of Ms. Behrens's battery and assault claims will be dismissed with the exception of her assault claim regarding the air punching incident, which will proceed to trial.[9]

### B. Reprisal Discrimination

Ms. Behrens also alleges that Mr. L'Heureux and Mr. Blaylark engaged in reprisal discrimination after she complained about their conduct. (Mem. in Opp'n at 16-23.) Under

---

[9] Mr. Blaylark argues that the air punching incident cannot constitute an assault because there is no evidence of any unlawful threat or a reasonable apprehension of immediate bodily harm. (See Blaylark Mem. in Supp. at 8.) Ms. Behrens testified as to how his conduct was assaultive: "[His] fists were closed, the look on his face, he looked very upset and angry, he looked wild. I thought the guy was going to . . . harm me physically. . . . [H]e was so angry looking in the hallway with his eyes and the way he was punching at me and the noises he was making, it was like some professional boxer. . . ready to attack me . . . [and] cause me some type of bodily harm." (Behrens Dep. Tr. at 190-91.) Her testimony raises a genuine issue of material fact as to whether she was assaulted. See Dahlin, 288 N.W. at 852.

the MHRA, it is unlawful for "any individual who participated in the alleged discrimination as a perpetrator, employer . . . or employee or agent thereof to intentionally engage in any reprisal against any person because that person . . . [o]pposed a practice forbidden [by the MHRA]." Minn. Stat. § 363A.15. "A reprisal includes, but is not limited to, any form of intimidation, retaliation, or harassment." Id. To establish a prima facie case of reprisal under the MHRA, Ms. Behrens must show: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) a causal connection between the protected activity and the adverse employment action. Bergstrom-Ek v. Best Oil Co., 153 F.3d 851, 859 (8th Cir. 1998); Hubbard v. United Press Int'l, Inc., 330 N.W.2d 428, 444 (Minn. 1983).

There is no dispute that Ms. Behrens engaged in protected activity. Mr. L'Heureux and Mr. Blaylark contend that Ms. Behrens's claims fail because she cannot demonstrate an adverse employment action. (See L'Heureux Mem. in Supp. at 9-10; L'Heureux Reply Mem. in Supp. at 2-9; Blaylark Mem. in Supp. at 12-13; Blaylark Reply Mem. in Supp. at 3-4.)

The Court finds that there are genuine issues of material fact as to whether Ms. Behrens suffered an adverse employment action. The Court will not attempt to analyze each and every adverse employment action allegation except to say that there is evidence that Ms. Behrens had her hours reduced on two occasions—January 1 and 3, 2003—when she was sent home early from work by Mr. L'Heureux and Mr. Blaylark respectively. See Bergstrom, 153 F.3d at 859 (cutting hours was adverse employment action).

In addition, after she complained to Ms. Green, Mr. Blaylark threw punches in the air towards her, and Mr. L'Heureux twice slammed the door in her face while yelling and once stomped his foot on the ground while looking at her. The MHRA defines "reprisal" as "any form of intimidation." Minn. Stat. § 363A.15. When interpreting a statute, the Court must give it a plain reading, and when the language is clear, the Court must not engage in further construction. See Gomon v. Northland Family Physicians, Ltd., 645 N.W.2d 413, 416 (Minn. 2002). Although not defined in the statute, Webster's Third New International Dictionary 1184 (1986) defines "intimidate" as "to make timid or fearful"; "inspire or affect with fear"; and "to compel to action or inaction." Viewing the evidence in light of the ordinary meaning of "intimidate," the Court finds that genuine issue of material fact exist as to whether Ms. Behrens suffered intimidation as reprisals for her complaints.

Mr. L'Heureux contends that Ms. Behrens "must prove a series of retaliatory incidents" to establish reprisal. (See L'Heureux's Reply Mem. in Supp. at 6-7 (emphasis in original).) He relies upon Mercure v. West Publishing Corp., 2003 WL 23024519, at *4 (Minn. Ct. App. Dec. 30, 2003) and Bassett v. City of Minneapolis, 211 F.3d 1097 (8th Cir. 2000) in support. However, Mercure says nothing about a series of retaliatory incidents, and Bassett merely observed that "a series of retaliatory conduct falling short of discharge or termination can, as a matter of law, constitute an adverse action." Bassett, 211 F.3d at 1105 n.16 (citing Kim v. Nash Finch Co., 123 F.3d 1046, 1060 (8th Cir. 1997) (emphasis added)). Neither case held, as Mr. L'Heureux would have it, that a series of retaliatory

incidents is required to make out a reprisal claim. Moreover, neither decision commented on the scope of an MHRA reprisal claim involving intimidation.

Mr. L'Heureux further contends that when determining whether intimidation is actionable as a reprisal under the MHRA, this Court should look to the standards used in hostile work environment claims and require the intimidation to be so "severe or pervasive" as to alter the terms and conditions of employment. (See L'Heureux Reply Mem. in Supp. at 7-8.) However, no authority is offered to support this contention. The Court declines to treat MHRA intimidation reprisal claims as hostile work environment claims, given that reprisal and hostile work environment are distinct claims which are analyzed in different ways. See, e.g., Woodland v. Joseph T. Ryerson & Son, Inc., 302 F.3d 839, 843 (8th Cir. 2002) (identifying "severe or pervasive harassment" as an element of a hostile work environment claim). Furthermore, the MHRA defines reprisal as "any form of intimidation, retaliation, or harassment." Minn. Stat. § 363A.15 (emphasis added). The disjunctive "or" indicates that the Minnesota legislature intended "intimidation" to mean something different than "harassment."

Finally, Mr. L'Heureux and Mr. Blaylark argue that the intimidation must be "material" in order to constitute reprisal. (See L'Heureux Mem. in Supp. at 10; L'Heureux Reply Mem. in Supp. at 5; Blaylark Reply Mem. in Supp. at 2-3.) Assuming that

intimidation must be material,[10] the Court finds that genuine issues of material fact exist as to the materiality of the intimidation.[11]

### Conclusion

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS ORDERED**:

1. Mr. L'Heureux's Motion for Summary Judgment (Doc. No. 30) is

   **GRANTED IN PART** and **DENIED IN PART**:

   a. Ms. Behrens's battery claims are **DISMISSED WITH PREJUDICE**; and

   b. The remaining claims against Mr. L'Heureux will proceed to trial; and

2. Mr. Blaylark's Motion for Summary Judgment (Doc. No. 43) is **GRANTED IN PART** and **DENIED IN PART**:

---

[10] In arguing that intimidation must be material, Mr. L'Heureux and Mr. Blaylark primarily rely on cases interpreting Title VII. However, Title VII does not contain the "any form of intimidation" language found in the MHRA. While the Minnesota Supreme Court has at times relied on Title VII principles when construing the MHRA, it is not bound by them. See Ray v. Miller Meester Advertising, Inc., 684 N.W.2d 404, 408 (Minn. 2004). Rather, the adoption of Title VII principles depends on the similarities between Title VII and the MHRA. See id.

[11] Mr. L'Heureux and Mr. Blaylark also argue that Ms. Behrens has not shown a causal connection between her protected activity and the adverse employment actions and intimidation. (See L'Heureux Reply Mem. in Supp. at 4; Blaylark Reply Mem. in Supp. at 4.) Considering the evidence as a whole, the Court finds that genuine issues of material fact exist regarding causation. See, e.g., Hubbard, 330 N.W.2d at 445 (stating that a causal connection may be demonstrated by showing "knowledge of the protected activity and the adverse employment action follows closely in time").

      a.      Ms. Behrens's battery and assault claims, with the exception of the air punching incident, are **DISMISSED WITH PREJUDICE**; and

      b.      The remaining claims against Mr. Blaylark will proceed to trial.

Dated: July 8, 2005                                                                                    s/Richard H. Kyle
                                                                                                           RICHARD H. KYLE
                                                                                                           United States District Judge